IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:05CR333 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Ann Aldrich |
| vs. | ) | |
| | ) | |
| RAYSHAWN J. STEVENS, et al., | ) | |
| | ) | |
| Defendants. | ) | MEMORANDUM AND ORDER |

This is a criminal case in which the United States government accuses Rayshawn J. Stevens ("Stevens") of being a felon in possession of a firearm, and Michael A. Medley ("Medley") of possessing both cocaine and crack cocaine with intent to distribute them. Now before the court are a pair of motions to suppress, one filed by each defendant (Docket Nos. 11 & 13). Medley alleges that police obtained evidence from him after the termination of a lawful stop and search. Stevens alleges that police illegally stopped and searched his vehicle and obtained evidence, including a confession, from him without first reciting his *Miranda* warnings.

A hearing was held before the court on September 1, 2005, and the parties were asked to submit post-hearing briefs on the merits of the motions to suppress. The government filed such a brief on October 28, 2005 (Docket No. 21); defense counsel has not complied with the court's request. For the following reasons, the court denies both motions.

**I. Background**

On June 22, 2005, Officers Gary Bartell and Jon Periandri of the Cleveland Police Department observed a moving vehicle "whose music was playing loud enough to be heard and the vibrations

therefrom to be felt more than 35 yards away." Medley's Motion, at 2. The officers observed the vehicle near the intersection of Superior Avenue and East 112th Street, and followed it as it turned off of Superior and on to East 115th. When the vehicle failed to signal its intention to turn, the officers performed a traffic stop.

After approaching the vehicle, which contained Stevens and Medley, the officers allege that they detected the odor of marijuana. Officer Periandri also noted that Medley "appeared nervous, fidgety, and was sweating profusely," Medley's Mot., *id*., and that he continually reached for the handle on his passenger door. Bartell, meanwhile, noted that Stevens reached toward his coin pocket, and that he presented a suspended license when asked for identification. When Periandri likewise requested identification from Medley, the latter produced an Ohio Offender identification card.

Stevens was then arrested for driving under suspension. Bartell's patdown of Stevens revealed a small quantity of marijuana. This discovery caused Periandri to request that Medley also exit the vehicle, after which it is alleged that Medley attempted to flee. Whether or not he did so attempt, the officers apprehended Medley, and recovered two plastic bags that fell from his waistband. One bag was determined to contain cocaine powder; the other, crack cocaine.

Police proceeded to search the vehicle, and recovered a Sturm Ruger 9-millimeter handgun, loaded with five rounds of ammunition, from the back seat. Cleveland authorities contacted the Drug Enforcement Administration ("DEA") Task Force, and alerted them to the arrests of Stevens and Medley. DEA Agent Jamaal Ansari and an agent from CPD's Narcotics Unit met Stevens and Medley at Central Booking.

The government alleges that Medley subsequently signed a written waiver of his *Miranda* rights, and delivered an oral and written account of his involvement with Stevens in a drug transaction. The

government also alleges that Stevens waived his rights orally before confessing to his possession of the gun. Defense counsel arrived at the station as "Stevens was about to sign his Warning and Waiver form," Gov't's Opp. at 9, and advised him not to do so. Stevens provided no written statement to the police.

## II. Discussion

### A. Medley's Motion

Medley concedes that the officers had probable cause, both to stop the vehicle and to detain its occupants. The above quotations regarding the loud music and Medley's suspicious conduct are typical of the concessions offered in Medley's summary of the facts. In seeking suppression of the "contraband found after Mr. Medley was handcuffed and led to the police vehicle," Medley's Mot. at 6, he argues only that his arrest and search were conducted after "any legitimate purpose for the stop had concluded." *Id*.

> The Sixth Circuit recently summarized and reaffirmed its key rulings in this area:
>
> Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. Because such a seizure affects the Fourth Amendment interests of all the occupants, [both] the driver and [the] passenger may each challenge his detention during the stop[.] The dual inquiry for evaluating the reasonableness of an investigative stop requires examination of whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*United States v. Perez*, 2006 FED App. 0093P, 2006 U.S. App. LEXIS 6094, at *14-*15 (6th Cir. 2006)(citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004); *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

Again, Medley concedes the first prong of this inquiry (justification "at the inception"). The court must therefore confine its analysis to the conduct of the officers following initiation of the traffic stop.

> An ordinary traffic stop ... is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry* apply to define the scope of reasonable police conduct. Reasonable police conduct under such circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference. **Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot.**
>
> [A]n officer may detain an individual after a routine traffic stop is completed if the officer has a reasonable suspicion that the individual is engaged in criminal activity.[It remains] well-settled law that the legality of the traffic stop is not dependent upon an officer's motivations. That is to say, an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle.

*United States v. Hill*, 195 F.3d 258, 263-64 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000) (emphasis added)(citing *Terry*, 392 U.S. at 20; *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc), *cert. denied*, 525 U.S. 1123 (1999); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995); *Whren*, 517 U.S. at 812-13; *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc), *cert. denied*, 513 U.S. 828 (1994)).

Applying this framework to the facts at bar, the court finds that Medley cannot prevail on his sole argument. Even if, as Medley claims, the purpose of the traffic stop was accomplished once the police had "spoken to Mr. Stevens about the loud music and the turn signal, and discovered that Stevens had a valid operator's license which had been suspended," Medley's Mot. at 5, Medley's conduct during the duration of the stop clearly gave rise to a "reasonable and articulable suspicion that criminal activity was afoot." *Erwin*, 155 F.3d 818 at 822.

At the September 1 hearing, Officers Bartell and Periandri testified persuasively regarding Medley's post-stop conduct, including his attempts to flee. Bartell testified that "the passenger [Medley] was breathing heavily," Suppression Hearing Transcript, at 10, and "sweating as if he was running a marathon." *Id*. at 41. Periandri confirmed that Medley "seemed extremely nervous. He was sweating, [his] chest was heaving up and down rapidly, [and he] kept looking out the window past me. ... He kept making gestures to the door as if to open it." *Id*. at 55. After Medley was asked to step out of the vehicle, Bartell testified that the defendant "refused to keep his hands on the car" and "attempted to jerk away." *Id* at 10. After the bag of powder cocaine fell from Medley's waistband, he "pushed [Bartell] back, [and] attempted to run ... a struggle ensued." *Id*. Periandri's testimony comfirmed both the initial attempt to flee, *see id*. at 57, and the ensuing struggle. "I ran over to help my partner; looked as if the defendant was trying to step on the bag and run at the same time, and they started falling over on the ground, and we all got in a tug of war match." *Id*. at 58.

Even in the absence of an attempt to flee (Medley claims that he did not run, but was "sucker-punched," *id*. at 206), the government could establish reasonable and articulable suspicion simply by reference to the smell of marijuana and the initial behavior of both passengers. *See United States v. Burton*, 334 F.3d 514, 517 (6th Cir. 2003). Because Medley concedes the initial legality of the stop, and because his subsequent arguments (and the hearing testimony) do not conclusively establish that the officers' post-stop behavior violated his constitutional rights, Medley's motion must be denied.

**B. Stevens's Motion**

Stevens argues: (1) that the officers lacked justification for the stop and the detention; (2) that the officers exceeded the scope of their authority in patting him down; and (3) that the police violated

his rights by obtaining statements from him without first reciting his *Miranda* rights and/or allowing access to his attorney.

Stevens's first two arguments, naturally, are undercut by his co-defendant's concessions regarding the circumstances of the stop and subsequent search (concessions which are all the more peculiar, considering that Medley is charged with the two drug-related counts, while Stevens is merely charged with possession of the firearm). As noted, both officers testified extensively regarding the loud music, the failure to signal, and the smell of marijuana which resulted in the detention and questioning of both defendants. Under *Hill*, the government has therefore established the existence of probable cause for the stop and the detention of Stevens.

Likewise, Stevens cannot succeed on his contention that the patdown search of his person exceeded the scope permissible under *Terry*. None of the state law decisions cited by Stevens contravenes the host of federal-court precedents upholding patdowns as a reasonable means of protecting officer safety following an arrest. *See, e.g., United States v. Montgomery,* 377 F.3d 582, 586 (6th Cir. 2004), *cert. denied,* 2005 U.S. LEXIS 1765 (Feb. 22, 2005), citing *Terry*, 392 U.S. at 27; *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004)(citing *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001)("officers who stop a person reasonably suspected of carrying drugs are entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions and to take reasonable measures to protect themselves")). Indeed, the conduct of the CPD officers in this case appears to mirror almost precisely the conduct originally authorized by the Supreme Court in *Terry* itself.

Stevens poses a slightly more tenable argument with his efforts to suppress testimony elicited from him while in police custody. Unlike Medley, Stevens apparently did not sign a waiver of rights

form. Stevens admits that Officer Periandri recited the *Miranda* warnings at the scene of his arrest, Hrg. Tr. at 172-73, but disputes the government's contention that he later waived his rights and provided an unsolicited confession to Agent Ansari. The parties agree that Stevens refused to cooperate, or to sign any waiver, once an attorney arrived in the interview room. Said attorney was clearly contacted by someone on Stevens's behalf, as Stevens neither makes reference to *his* counsel, nor claims that he requested to speak to anyone before making a statement to Ansari. In fact, Stevens does not dispute the government's claim that he was "asked if he had an attorney. He said no, he didn't." *Id*. at 111.

This last detail is fatal to Stevens's argument. As the Supreme Court first held in *Edwards v. Arizona*, 451 U.S. 477 (1981),

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. ... [A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id*. at 484-85; *see also Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004). Sixth Circuit cases construing and elaborating on this seminal holding are very clear. Requests for assistance "must be unambiguous to trigger [*Edwards*'s] protection. Moreover, the request cannot be for just any sort of assistance, but for the particular sort of lawyerly assistance that is the subject of *Miranda*." *United States v. Suarez*, 263 F.3d 468, 482-483 (6th Cir. 2001)(quoting *McNeil v. Wisconsin*, 501 U.S. 171, 179 (1991))(other citations omitted).Even viewing the facts in a light most favorable to Stevens, it cannot reasonably be said that the defendant made an unambiguous request for the particular sort of lawyerly assistance that

is the subject of *Miranda*. *Edwards*, therefore, does not require suppression of Stevens's post-warning statements[1].

### III. Conclusion

For the foregoing reasons, the court denies the motions to suppress filed by both defendants. Trial will proceed as scheduled, beginning on April 3, 2006. Proposed Jury Instructions, voir dire and witness lists are due one week prior to the trial date.

IT IS SO ORDERED.

                                                              s/Ann Aldrich
                                                              ANN ALDRICH
                                                              UNITED STATES DISTRICT JUDGE

Dated: March 20, 2006

---

[1] As the government does not appear to have any recording, written or otherwise, of these statements, the court anticipates that they will be introduced at trial in the same form as at the suppression hearing – *i.e.*, within testimony given by Ansari, and disputed by Stevens (who denies making any confession whatsoever).